Eugene K Mallard
1301 K264 HWY
Larned Kansas 67550

Telephone:    (620) 285-4660 ext. 4

FILED
U.S. District Court
District of Kansas

OCT 1 0 2023

Clerk, U.S. District Court
By _____ Deputy Clerk

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **Eugene K. Mallard**. Plaintiff<br><br>v.<br><br><br>**Laura Howard,** Secretary KDADS, et al.,<br><br>        Defendants. | **Case No.      5:22-cv-04053-EFM-KGG** |

## **RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

I, Eugene K. Mallard, come forward and formally respond to the arguments made by Defendant(s) counsel in Document 27 and 28 and all Exhibits attached thereto, requesting Summary Judgment in favor of Defendant.

### STATEMENT OF MATERIAL FACTS TO WHICH NO GENUINE ISSUE EXISTS

In reviewing the section titled "Statement of Material Facts to Which No Genuine Issue Exists," in Document 28, by Defendant(s), I hereby contest some as untrue and agree with the truthfulness of others.

The following paragraphs are admitted as true: 1,2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 16, 18, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45,

46, 47, 48, 49, 51, 52, 53, 54, 55, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 76, 77, 78, 80, 81, 82, 83, 84, 85, 87, 88, 90, 92, 93, 94, 96, 97, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134.

The remaining paragraphs are deemed untrue and the correct facts for each of these paragraphs are as follows:

**Defendant(s) Paragraph 3:** It was clearly established by the Kansas Attorney General and Kansas Court of Appeals that the SPTP program is not a program or part of Larned State Hospital. It is a separate and distinct entity with its own laws, head of facility, and even its own budget line. *[See Arguments and Authorities of this Memorandum for Specifics]*

**Defendant(s) Paragraph 7:** Eugene Mallard originally was placed in Dillon Building on October 8, 2009. Throughout his years in the facility Mr. Mallard has been housed in different areas. Most recently in 2021 he was placed back in Dillon Building. [Exhibit A, Pg. 1 ¶ 2]

**Defendant(s) Paragraph 14:** Eugene Mallard is a member of the Red Wolf Native American Callout. In his time in the facility Mr. Mallard has been a member of the Red Wolf and Independent Native American callout. At no time has Mr. Mallard been a member of the Grey Wolf Native American callout. [Exhibit A, Pg. 1 ¶ 3-6] and [Exhibit B, Pg. 2 ¶ 8] and [Exhibit C, Pg. 2 ¶ 8]

**Defendant(s) Paragraph 15:** The theater on LSH grounds is outside the perimeter of the SPTP program in Dillon, Isaac Ray, and Jung building. As such those in SPTP do not have access to it or the ability to use it for any religious gathering. Inside the perimeter of Dillon building there is a large room that is sometimes referred to as a theater. [Exhibit A, Pg. 6 ¶ 45] and [Exhibit B, Pg. 5 ¶ 41] and [Exhibit C, Pg. 5 ¶ 45] and [Exhibit D, Pg. 3 ¶ 22] and [Exhibit E, Pg. 5 ¶ 52]

**Defendant(s) Paragraph 17:**Members of the Red Wolf, Grey Wolf or Independent Native American callout that are on Security Risk Status are allowed to be on the religious grounds and are not required to meet in the mod yard. [Exhibit A, Pg. 6 ¶ 48-50]

**Defendant(s) Paragraph 19:**The mod yard is comprised of the same chain link fence as that of the religious ground. It has two fences and contains no wall. On one side there are three buildings, but no wall. [Exhibit A, Pg. 4-5 ¶ 33-36] and [Exhibit B, Pg. 4 ¶ 30-33] and [Exhibit C, Pg. 5 ¶ 34-37] and [Exhibit D, Pg. 2 ¶ 11-14] and [Exhibit E, Pg. 4 ¶ 40-43]

**Defendant(s) Paragraph 21:**The Independent Native Americans is a group comprised of those who do not belong or are not allowed to be a part of the Red Wolf or Grey Wolf Native American callout. The Independent group was start by an individual that walked a different path than the Red Wolf and Grey Wolf and requested to do so. Some members of Independent group were members of Red Wolf and Grey Wolf previously, but removed for cause. [Exhibit A, Pg. 1 ¶ 7-8] and [Exhibit B, Pg. 2 ¶ 11-12] and [Exhibit C, Pg. 2 ¶ 12-13]

**Defendant(s) Paragraph 50:**The religious callouts are not responsible for contraband or escape. The escape occurred in 2010 due to staff laziness and inappropriate attention. The individual used the call out to further his means after he befriended a staff member who brought him tools to cut the fence. Then the staff doing the callout did not do a head count allowing him to be left unattended. This occurred thirteen years ago and since then the facility has remedied all the issues except for staff bringing contraband. [Exhibit E, Pg. 5-6 ¶ 53-58]

**Defendant(s) Paragraph 56:**The time allotted for each call out is not balanced when viewed in light of that same religion in society. The Christians receive ninety-six (96) percent of what they would have in society while the Native American Religions receive about forty (40) percent of what they would have in society. *[See Arguments and Authorities of this Memorandum for Specifics]*

**Defendant(s) Paragraph 57:**There is no weekly meeting with Gabriel Rop and the LSH Chaplain. [Exhibit B, Pg. 5 ¶ 42] and  [Exhibit C, Pg. 6 ¶ 46]

3

**Defendant(s) Paragraph 70:**The Independents was started by an individual that wished to practice in a manner opposite of the Red Wolf and Grey Wolf. In Native American culture, each tribe (Navajo, Sioux, Cherokee, Plains, etc.) practices in a different manner. Today, the Independents are not a splinter group of Grey Wolf and is comprised of those that are denied membership in Red Wolf and Grey Wolf. [Exhibit A, Pg. 1 ¶ 7-8] and [Exhibit B, Pg. 2 ¶ 11-12] and [Exhibit C, Pg. 2 ¶ 12-13]

**Defendant(s) Paragraph 79:**The facts alleged herein are not fully set out. There is an alleged advisor that Jeff Brown communicates with, but they do not identify said person and provide contact information. This denies the Court and Plaintiff the ability to determine the truthfulness of this.

**Defendant(s) Paragraph 86, 91:**   The facts are only partially true. What the bans have never prevented are non-careless fires, fires in grills or outdoor equipment, or a fire in a developed recreational site. The Native American callout grounds is a developed recreational site or the fire could be done in a grill or outdoor equipment.

**Defendant(s) Paragraph 89, 91:**   The facts alleged show that the facility only focuses on the most restrictive measures rather than the least restrictive measures. At all times the Red Wolf and Grey Wolf have a water hose on and in standby position. In addition within 100-300 feet is a fire hydrant, that can have a hose attached and be manned by one trained person, that would quickly distinguish any fire that may start or one that could go out of control. [Exhibit A, Pg. 5 ¶ 36] and [Exhibit B, Pg. 4 ¶ 33] and [Exhibit C, Pg. 5 ¶ 37] and [Exhibit D, Pg. 2 ¶ 14] and [Exhibit E, Pg. 4 ¶ 43]

**Defendant(s) Paragraph 95:**The meals provided are not seasonal and do not reflect an appropriate meal for the religion or the season. They have one set meal plan that is in effect for the entire year with no seasonal changes. [Exhibit A, Pg. 3 ¶ 19-20] and [Exhibit B, Pg. 3 ¶ 23-24] and [Exhibit C, Pg. 4 ¶ 24]

**Defendant(s) Paragraph 98:**This is a bald allegation with no facts. They have no recorded temperatures to show the food was not in range and no documented evidence of one being sick. In fact if food temperature is such an issue then they need to clean their own house first, for they never serve a meal at temperature, thus endangering, per their words, the lives of all in the SPTP program. [Exhibit A, Pg. 3 ¶ 22-24 & Pg. 4 ¶ 26-31] and [Exhibit B, Pg. 4 ¶ 26-28] and [Exhibit C, Pg. 4 ¶ 26-32] and [Exhibit E, Pg. 3-4 ¶ 32-39]

**Defendant(s) Paragraph 135, 136, 137:**   The facts herein are untrue to the knowledge at hand.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. When applying this standard, the court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. *New York Life Ins. Co. v. K N Energy*, 80 F.3d 405, 408-409 (1996).

## ARGUMENTS AND AUTHORITIES

I.      **One should first clean their own house before alleging an impropriety on another.**

There is an old saying that one who lives in a glass house should not throw rocks. The reason for this is it will cause them more harm and loss than it causes the other. In reviewing whether or not summary judgment should be granted the Defendant(s) argue that the Native Americans should not be allowed to prepare their own food, because they do so in a manner that is harmful to themselves. [Document 28, Pg. 36-37]

The specific harm comes from the fact that they allege that they serve themselves food that is not at the correct temperature. This is a failing allegation for: (1) They provide no evidence; and (2) They do the exact same thing daily and when one complains they refuse to make changes.

In making the allegation that the Native Americans did not serve the food at temperature, they bring forth nothing more than a sworn declaration from a person who was not present at the callout. [Exhibit A, Pg. 3 ¶ 22-24 & Pg. 4 ¶ 26-31] and [Exhibit E, Pg. 3-4 ¶ 32-39]. There are no dates, times, or actual temperatures listed to give an evidentiary basis for this allegation. In fact as the person was not there it would be a question of whether or not this is hearsay and inadmissible.

Mr. Mallard cannot contest the allegation as it is baseless and provides no facts for which he can discern, investigate and put an answer to. The evidence Mr. Mallard presents is that the food was more at temperature when they prepared their own meal than it is when served by the Defendant(s). [Exhibit A, Pg. 3 ¶ 22-24 & Pg. 4 ¶ 26-31] and [Exhibit B, Pg. 4 ¶ 26-28] and [Exhibit C, Pg. 4 ¶ 26-32] and [Exhibit E, Pg. 3-4 ¶ 32-39]

Second, the evidence brought forth by the Plaintiff shows that he is served three meals a day by the Defendant(s) that are out of temperature range. [Exhibit A, Pg. 3 ¶ 22-24 & Pg. 4 ¶ 26-31] and [Exhibit B, Pg. 4 ¶ 26-28] and [Exhibit C, Pg. 4 ¶ 26-32] and [Exhibit E, Pg. 3-4 ¶ 32-39]. According to the Defendant(s) argument they are endangering his life every day and ignoring to change it. Should they be allowed to complain and receive summary judgment for what they do? The answer would be no.

Summary judgment should not be granted on a bald accusation with no facts, when the evidence brought forth shows the Defendant(s) violate the very principle they argue is a danger to Mr. Mallard's life on a daily basis.

II.     **The Defendant(s) openly admit a violation of Mr. Mallard's rights and liberty interests.**

The Defendant(s) profess that any and all rules, policies, or procedures governing Mr. Mallard's religion are a product of Larned State Hospital and enforced or are in place by employees of Larned State Hospital. [Document 28 and all Exhibits]

In 1994 the Kansas Legislature created the Kansas Sexually Violent Predator Act (KSVPA) creating a confinement scheme for one who is not mentally ill but has a compulsion to sexually offend against others due to a mental abnormality or personality disorder. Thus, they are not a prisoner and are not a normal civil commitment. They are a citizen that needs to be kept from the public.

The State first placed the program inside a Department of Corrections (DOC) facility until the year 2000. During this time the Kansas DOC asked the Attorney General if there rules and policies could be applied to a sexually violent predator (SVP) as they were housed in their facility. The Attorney General for Kansas clearly stated that they could not be applied to SVP's. 1994 Kan. AG LEXIS 149.

After a few years those confined under the KSVPA were moved from the DOC facility to a unit on the campus of Larned State Hospital. In 2008 the Court of Appeals weighed in after reviewing and interpreting the KSVPA. The Court of Appeals found that the KSVPA commits the person to the custody of the Secretary of KDADS, not the superintendent of Larned State Hospital, which is how the normal civil commitment scheme works. *Merryfield v. Larned State Hospital,* 2008 Kan. App. Unpub. LEXIS 1019; 197 P.3d 906.

Under the Court of Appeals ruling one under the KSVPA cannot sue or hold liable any person who works for Larned State Hospital, the Superintendent included. They have no statutory authority to supervise, operate or run the program under the KSVPA.

This issue again arose in the context of a 42 U.S.C. 1983 petition that ended up with the Kansas Court of Appeals. This case, *Brull v. Jordan,* 2011 Kan. App. Unpub. LEXIS 59; 246 P.3d 413 , held the following:

> "To show that he is not the proper party in this case, the Secretary points to his factual statements, which allege that other parties adopted the treatment program's policies, not the Secretary. But based on the Secretary's statutory responsibilities alone—to which Brull and Stockwell referred in their summary-judgment response—the Secretary has a direct connection with enforcing the allegedly unconstitutional treatment methods and confinement conditions.
> By law, sexually violent predators are committed to the Secretary's custody for control, care, and treatment. K.S.A. 2009 Supp. 59-29a07(a). Patients have a right to adequate treatment and humane confinement conditions, and the care and treatment must also conform to constitutional requirements. K.S.A. 2009 Supp. 59-29a22(b)(3), (b)(9); K.S.A. 59-29a09. Moreover, the Secretary is responsible for the cost of the patients' care and treatment. K.S.A. 2009 Supp. 59-29a12(a). By allowing the treatment program's staff to adopt and implement policies that are contrary to the patients' constitutional and statutory rights, which the Secretary has a duty to preserve, the Secretary would be enforcing unconstitutional policies.
> This is not a case of respondeat superior, where a supervisor is held liable solely based on the wrongdoing of an agent or employee. The Secretary has a direct and statutory duty to those who have been placed in his custody, and the plaintiffs' cause of action arises out of the Secretary's claimed failure to fulfill his own statutory duties to these patients.
> A person acts under the color of state law when he or she exercises power possessed by virtue of state law and made possible only because he or she has state-law authority. *Fisher v. Lynch,* 571 F. Supp. 2d 1230, 1235 (D. Kan. 2008). The Secretary acted—or failed to act—here under his statutorily conferred responsibility over Brull and Stockwell, who are in the Secretary's legal custody."

At the position of this case the Kansas Legislature has not saw fit to change the KSVPA to alter the rulings in either of the cases. The Act is replete with references and requirements that the Secretary of KDADS is responsible and required to draft and promulgate the policies and procedures and enforce the rights for which Mr. Mallard is entitled to. Then the Legislature creates a separate budget and funding for Larned State Hospital and the Kansas Sexual Predator Treatment Program (KSPTP). Why would this be if they were the same entity? The Courts have sounded that they are not one and the same and the KSPTP is only a guest using space on the campus of Larned State Hospital.

The normal civil commitment scheme found in the Kansas Statutes Annotated is replete with statements that none of its provisions are applicable or to be used by or for one confined under the KSVPA. The legislative intent is clear.

The Defendant(s) admit that the only policy in place to restrict or set the rules for Mr. Mallard's practice of religion is an LSH Policy. One which was drafted and promulgated without the input or participation of the Secretary of KDADS. [Exhibit A, Pg. 5 ¶ 40-42] and [Exhibit B, Pg. 5 ¶ 36-38] and [Exhibit C, Pg. 5 ¶ 40-42] and [Exhibit E, Pg. 5 ¶ 47-49]. In addition they claim that Lesia Dippman, Superintendent LSH, and Jeff Brown, Chaplain LSH, both employees of LSH and not SPTP are the controlling forces.

The Kansas Courts have held there is no general or common law power that can be exercised by an administrative agency. Rules or regulations of an administrative agency, to be valid, must be within the statutory authority conferred upon the agency. Those rules or regulations that go beyond the authority authorized, which violate the statute, or are inconsistent with the statutory power of the agency have been found void. *Durrett v. Bryan*, 14 Kan. App. 2d 723, 727 (1990).

Federal courts' jurisdiction is confined within such limits as Congress sees fit to prescribe. One such limit is hidden in 28 U.S.C.S. § 1257's positive statement that final judgments or decrees rendered by the highest court of a State may be reviewed by the U.S. Supreme Court. If the Supreme Court can review final judgments from state courts of last resort, then lower federal courts cannot. That negative inference is called the Rooker-Feldman doctrine. *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 385.

The Kansas Courts are clear that Lesia Dippman and Jeff Brown violated and over exceeded their statutory authority, the LSH Policy concerning religion is inapplicable in SPTP and Laura Howard was and is responsible for creating and putting in place a valid and legal policy for Mr. Mallard's right to practice his religion. A fact they admit they have not done.

To set this more in an applicable sense we look to the tribal lands within the United States of America. The Native Americans are provided land, but cannot be made to comply with the laws and requirements of the rest of the United States. They have their own government, police, and systems. The State the land is in cannot control or force them to comply with its own laws or rules. This is how the Legislature has set the KSVPA, no matter whose land or facility they are in they are to operate on their own with no outside interference.

Another example is whether or not HIPAA applies. The Court of Appeals for Kansas reviewed this and held that under the KSVPA the law is more stringent and therefore HIPAA is inapplicable to those confined under the KSVPA. *Merryfield v. Kan. Soc. & Rehab. Servs.*, 44 Kan. App. 2d 324. On the other hand HIPAA is applicable to one in Larned State Hospital. This is another example of difference between LSH and SPTP and the reason LSH is not applicable in SPTP, the facility under the KSVPA.

Under *Rooker-Feldman* it is argued that this Court has no ability to overturn the State Court decisions and therefore, summary judgment in favor of Mr. Mallard should be given against Defendant Lesia Dippman, Jeff Brown, and Laura Howard.

III.     **Administrative remedies are not required to be exhausted.**

Defendants argue that the case should be dismissed for Mr. Mallard did not exhaust administrative remedies. [Document 28 Pg. 40]

The requirement to exhaust administrative remedies is not a total bar, there are exceptions to the requirement to exhaust. These have been defined by the State Court of Appeals and thus under *Rooker-Feldman*, this Court would lack jurisdiction to overturn the State Court's interpretation of its own laws.

The Court of Appeals held that federal law preempted the exhaustion requirement of Kan. Stat. Ann. § 59-29a24 (Supp. 2018) where Congress intended for people, other than prisoners confined in jails, prisons, and other correctional facilities, to be able to bring 42 U.S.C.S. § 1983

claims without having to exhaust available administrative remedies, any state law to the contrary was invalid for burdening the exercise of a federal right, and although there may have been good policy reasons for requiring exhaustion, those state policies were not enough to contravene congressional intent. *Burch v. Keck*, 56 Kan. App. 2d 1162, 444 P.3d 1000, 2019 Kan. App. LEXIS 32 (Kan. Ct. App. 2019).

The Courts in Kansas have clearly declared that their state law cannot run the Federal Court system or trump the congressional intent. Therefore, there is no requirement to exhaust administrative remedies before proceeding with this suit.

### IV.     The Defendant(s) openly admit a religious discrimination.

The Defendant(s) argue that because they allow every religious sect or denomination a total of two hours per week there can be no discrimination. [Document 28, Page 32-33]

In order to properly review this we must look to what those in society do to practice their religion. For this the following is stated:

a.  A normal Christian (includes Baptist, Catholic) practice is two hours of church per week. With an option of one hour of Bible study. This would be a total of three hours per week. For the year this would total one-hundred and fifty-six hours.

b.  A normal Christian can have Bible study any time by meeting on a unit in accords with the rules. Whereas, a Native American cannot for it requires an outdoor area.

c.  The Native American practice requires a smudge period of about fifteen minutes per day, a total of one-hundred and five minutes, 1.75 hours, per week. A Pipe and Drum Ceremony, at two hours per week. A sweat lodge ceremony, once per month, or more as needed, for twelve hours. Two Pow Wows per year at twelve hours each for a total of twenty-four hours. Feasts to celebrate special events no less than four per year, but usually a total of eight, at eight hours each for a total of sixty-four hours. For the year this would be a total of four hundred and twenty-seven hours per year.

Using the numbers utilized by the Defendants, the following is the truthfulness, which shows discrimination:

a.  A normal Christian practice receives 104 of the 156 hours a citizen would have. This equates to a percentage of 66%.

b.  A Native American practice receives 104 of the 427 hours a citizen would have. This equates to a percentage of 24%.

c.  If a Christian was given the same 24% as a Native American they would be allotted 37 hours per year, or 0.71 hours (42 minutes) per week.

d.  If a Native American was given the same 66% as a Christian they would be allotted 282 hours per year, or 5.42 hours (325.2 minutes) per week.

Certain religious practices are more involved and require more time to properly follow and exercise. Eugene Mallard is willing to compromise to a point, however, anything less than that which was provided prior to Covid pandemic would and is what is being challenged as wrong.

By granting the Christians the majority of the time they would be allowed as a citizen outside of the facility and not providing the same to Mr. Mallard is religious discrimination and is admitted to by the Defendants.


V.  **The Defendant(s) openly admit a violation of the Fourth Amendment of the United States Constitution.**

The Defendant(s) present that Mr. Mallard must subject himself to a strip search by a law enforcement officer in order to practice his religion.

As a civilly confined SVP the Fourth Amendment and its protections are applicable to Mr. Mallard. *Bailey v. Howard*, 2012 Kan. App. Unpub. LEXIS 230, citing the opinion of *Serna v. Goodno*, 567 F.3d 944, 948-49 (8th Cir. 2009).

Here the Defendant(s) are instituting a Larned State Hospital policy that states Mr. mallard will be strip searched by a Larned State Hospital Security Officer on his way to the callout and on his way back from the callout. As previously discussed this may be fine with the laws concerning those housed in Larned State Hospital, thus a reason the policy should not again apply, but SVP's are under a different set of laws and the Court has found them to retain their Fourth Amendment rights.

A Larned State Hospital Security Officer is a law enforcement officer. K.S.A. 76-12a16. The Kansas Court of Appeals found that Law Enforcement officers (LSH Security or DOC Officers) must have probable cause or a warrant before executing a search. *Merryfield v. Sullivan*, 2014 Kan. App. Unpub. LEXIS 341.

Prior to going to the area in which to be strip searched Mr. Mallard has a full frisk search of his person completed by a staff member of the facility. This then negates any probable cause for a law enforcement officer to then subject him to a strip search.

Therefore, the policy is an LSH policy and by previous ruling of the Courts is inapplicable as it is based on a set of laws that the Legislature clearly dictated are not applicable to a confined SVP. In addition the search is a targeted search by a law enforcement officer with no probable cause or warrant, therefore a violation of the Fourth Amendment rights of Mr. Mallard is admitted to by Defendant(s). It is also not the least restrictive rather it is the most egregious, a full naked body search.

**VI.     The Defendant(s) argue that the RFRA is not applicable.**

The Defendant(s) present that the Religious Freedom Restoration Act is an unconstitutional act as applied to the States.

Based on the case cited by the Defendant(s) Mr. Mallard would somewhat occur but argue it is not true. The reason it is untrue based on the actions the State of Kansas has taken.

13

A state created liberty interest protected by the Fourteenth Amendment of the United States Constitution, when its law is clear, unequivocal and removes the discretion on the part of the officers or it agents.

Whether an interest created by state law rises to the level of a "liberty interest" protected by the Due Process Clause of U.S. Const. amend. XIV is a matter of federal law. *Cramer v. Rommell*, 1993 U.S. App. LEXIS 26808.

The requirement of a state-created liberty interest is the threshold requirement for any due process claim, whether substantive or procedural. Parker v. Sirmons, 152 Fed. Appx. 705, 708 (2005).

In 2013 Kansas Legislature passed and enacted the Kansas Preservation of Religious Freedom Act, K.S.A. 60-5301 et seq. This Act is identical to the RFRA and holds the same provisions. It also grants the right to the following:

A. That the Government shall not substantially burden a person's civil right to exercise of religion even if the burden results from a rule of general applicability, unless such government demonstrates, by clear and convincing evidence, that application of the burden to the person: (1) Is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

B. A person whose exercise of religion has been burdened, or is substantially likely to be burdened, in violation of this act, may assert such violation as a claim or defense in a judicial proceeding. A court may grant appropriate relief as may be necessary including: (1) Injunctive relief; (2) protective order; (3) writ of mandamus or prohibition; (4) declaratory relief; (5) actual damages; or (6) costs and attorney fees determined by the court.

If it is held that the RFRA is not applicable to the States, Kansas remedied this by putting an identical Act in place that grants Mr. Mallard the right to seek relief by any court of competent jurisdiction.

**VII. The Defendant(s) cite two inapplicable cases.**

The Defendant(s) argue that the decision in *McRoy v. Sheahan* and *Beyer v. Deslauriers* support that they should be given summary judgment. A review of these cases show that they should not be applied to this case.

*McRoy v. Sheahan* was a one page decision upholding the District Court's dismissal for the Plaintiff failed to do anything other than make conclusory denials. A fact that is not present in this case.

*Beyer v. Deslauriers* is a case that deals with whether or not there is adequate treatment in the facility under the KSVPA. It does not challenge or set any rights concerning one's right to practice their religion. In fact the holding is that the prevailing treatment is that which makes the confinement scheme constitutionally valid.

**VIII. The Native American Callout has occurred for over twenty years and Defendant(s) cite to no actual risk to the facility that has occurred.**

The Red Wolf Society began in the facility about the year 2003. Since its inception the members were allowed, until recently:

    A. A smudge ceremony once per day.

    B. A monthly sweat ceremony from 0800 AM to 1600 (4:00 PM).

    C. Eight feasts or meals a year.

    D. A weekly two hour pipe and drum ceremony, unless it was sweat ceremony. At which time it was combined.

    E. The ability to buy and prepare traditional Native American foods for their feasts.

Then COVID came along. Mr. Mallard does not argue that his rights should have been suspended during the worldwide Pandemic, but rather argues that at the conclusion the facility should have returned the religious practices back to the same as pre-covid.

The only issue the facility points to is there was one escape that occurred from a Native American call out. However, they do not show the facts of the situation, which are:

A. The staff in charge of the call out did not track how many individual residents went to the call out and how many returned. This allowed the individual to be left outside on his own.

B. The individual that escaped had a relationship with a staff member. This staff member brought him the tools needed to escape (i.e. fence cutters, etc.).

Since the escape the facility has taken measures to ensure it does not occur again, but not all necessary procedures. These are as follows:

A. They count those going and coming through use of a written movement roster.

B. They have installed more cameras.

C. They have moved the religious grounds to a closer area, that now has two fences instead of one.

D. They have cleared all obstacles (trees, buildings, bushes, etc.) that would block the camera view of the area.

They have failed to cure the ability of staff to bring contraband to residents in the program. This is another instance of one should not be heard to complain when they are the problem and refuse to correct it themselves.

The only other incident the Defendant(s) allege is that the individuals were putting themselves in danger by not cooking the food properly. This bald allegation has been previously addressed and for brevity need not be discussed again.

## IX.    The RLUIPA

The Defendant(s) argue that the RLUIPA does not allow recovery for duration or frequency of religious ceremonies.

Most recently the United States District Court for the District of Nevada found that inmates could sue and recover concerning duration or frequency of religious callouts, even monetary damages, in prison. See *Shaw v. Davis*, USDC (D. Nev.) Case No. 3:18-cv-00551; 2022 U.S. Dist. LEXIS 144298; 2022 WL 3339550.

Mr. Mallard as an SVP has a liberty interest to have the same rights as inmates or prisoners and the denial of those same rights is a violation of his rights under the Fourteenth Amendment of the United States Constitution. *Chubb v. Sullivan*, 50 Kan. App. 2d 419, Syl. ¶ 2 (2014).

## X.   The Defendant(s) have failed to show how the Native American practice will effect treatment.

The Defendant(s) argue that the Native American callout will interfere with the main intent of the program, treatment.

The Native American callout has historically occurred on Saturday or Sunday with the exception of the daily smudge and certain feasts. The program historically has never had treatment on Saturday or Sunday.

As to the other days of the week the Defendant(s) set the schedule even for callout.  Thus, if there is any interference with treatment it would be because of an action of the Defendant(s) and not the religious callout.

If the Defendant(s) truly care about preserving one's religious freedom they would have these callouts on the schedule like any other part of treatment which would exclude something from being scheduled at that time. That would then ensure that no religious callout could interfere with treatment.

Currently there are religious callouts scheduled during therapy time and the Defendant(s) ensure those individuals are not scheduled for therapy during that time.

There is no effect on treatment by Eugene Mallard practicing his religion in accords with his sincerely held belief. If there is a conflict it is because of the actions of the Defendant(s) and not by any part of Mr. Mallard's religion.

**XI.      The Secretary has failed to hire adequate administration to run the program.**

The Defendant(s) argue that the new time constraints on the Native American religion are due to the needs of the facility. However, Pre-COVID there was no issue.

Prior to COVID-19 the Native American religion smudged daily at a set time, had eight feasts a year, held forty Pipe and Drum Ceremonies, and held twelve Sweat Lodge Ceremonies from 8:00 AM - 4:00 PM. The feasts were meals that the individuals paid for the items and cooked/prepared themselves and then sat down and had the feast. At no time did any person ever become sick. The facility had visitation from 8:30 AM – 3:30 PM every Saturday and Sunday. This occurred for almost twenty years without incident.

Then along come COVID-19 and the world stopped, not just in society, but in the program as well. Now that we are past COVID-19 to a point, the world returned to what it was before, for the most part. However, in SPTP the return was with greater restrictions and no proper justification for said change.

Today, there are more staff on the units, more administration, more AT staff, more therapists, and more of just about everything, but the religious practices have been altered to the point that one cannot practice their sincerely held beliefs, why? That is the purpose of this suit and Defendant(s) have come forward with no evidence to show a proper reason.

It might just be that those in charge today are less competent than the previous administrators. This would then mean that the Secretary for KDADS, Laura Howard has failed in her duty to ensure that all rights are upheld and ensured.

It is a known fact that no state run institution will ever be adequately staffed. However, it is the duty of the Defendant(s) to ensure that no rights are violated just because they are short of staff, funds, or facilities.

## XII. Perjury

The Defendant(s) swore out declarations under penalty of perjury. [Document 28] The declarations brought forth by Eugene Mallard show that the Defendant(s) openly lied in their declarations in an attempt to persuade this Court to dismiss this case.

Mr. Mallard asks the Court to not be persuaded by the laws, but to take appropriate action to ensure these Defendant(s) do not do this again.

## XIII. The failure to request that documents be sealed.

The Defendant(s) by and through counsel submitted many private medical records and names of person confined in the program with their Motion for Summary Judgment. [Document 28] The same Defendant(s) and legal counsel never moved for those documents to be sealed.

Under State law they have a duty to ensure this information does not become public, however, in their rush to get the case dismissed they have trampled the rights of those they confine. This is just another instance of the abuse they utilize without a care.

## CONCLUSION

Eugene Mallard prays this Court will deny Summary Judgment and find there is a trier of fact issue that his religious rights and practice as a Native American are egregiously violated by the Defendant(s). In addition Mr. Mallard asks this Court to find that the abuse of persons in the custody of the Defendant(s) continued by their filing for summary judgment and including lies in the declarations made under penalty of perjury.

Ultimately the Court could grant summary judgment in favor of Mr. Mallard and negate the need for a trial, however, there are factual issues in contention and Mr. Mallard is aware that this is normally the reason a trial is held.

## Exhibit List

Attached hereto is five exhibits labeled A-E, these are labeled as follows:

Exhibit A:      Declaration of Eugene Mallard

Exhibit B:      Declaration of Valdie T. Barnett

Exhibit C:      Declaration of Jimmie A. Sebek

Exhibit D:      Declaration of James A. Stout

Exhibit E:      Declaration of Dustin J Merryfield

**Executed on October 6, 2023**

Eugene K Mallard
1301 Ks. Hwy 264
Larned, Ks. 67550
620-285-4660 Ext. 4

## CERTIFICATE OF SERVICE

**Eugene K Mallard** hereby declares that on the ___6th___ day of **October**, **2023**, he placed a true and correct copy of the above and foregoing in the facility mail system to be given to the United States Postal Service for delivery. Each envelope was properly addressed with appropriate postage affixed and was addressed to:

Clerk of the Court
403 US Courthouse
401 N. Market Street
Wichita, KS. 67202

Matthew Shoger
Assistant Attorney General
Attorney for Defendants
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612
Tel: (785) 368-5244 | Fax: (785) 291-3767
Email: matthew.shoger@ag.ks.gov

Eugene Mallard
Plaintiff, *Pro Se*
1301 K264 HWY
Larned Kansas 67550-5353