## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EUGENE K. MALLARD,

        *Plaintiff,*

v.

        Case No. 22-4053-EFM

LAURA HOWARD and GABRIEL ROP

        *Defendants.*

## MEMORANDUM AND ORDER

Before the Court is Defendant Laura Howard and Gabriel Rop's Motion for Summary Judgment (Doc. 27). Pro se plaintiff Eugene Mallard brings a 42 U.S.C. § 1983 suit against Defendants, asserting violations of his religious freedom under the First Amendment, the Religious Freedom Restoration Act ("RFRA"),[1] the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[2] and the Kansas Preservation of Religious Freedom Act ("KPRFA").[3] He also claims that Defendants violated his Eighth and Fourteenth Amendment rights. Then, for the first time in his Response, Mallard alleges that Defendants violated his Fourth Amendment rights. Mallard seeks declaratory judgment and injunctive relief on each claim. Defendants now move for summary judgment on all of Mallard's claims. For the reasons stated below, the Court finds that Mallard fails to provide evidence establishing a genuine issue of fact as to any of his claims, and

---

[1] 42 U.S.C. §§ 2000bb *et seq.*

[2] 42 U.S.C. §§ 2000cc *et seq.*

[3] K.S.A. §§ 60-5301 *et seq.*

Defendants are entitled to judgment as a matter of law. Therefore, the Court grants Defendants' Motion as to Plaintiff's federal claims and declines to exercise supplemental jurisdiction over his remaining state law claim.

## I.      Factual and Procedural Background[4]

Plaintiff Mallard resides at Larned State Hospital as an involuntary civil committee under the Kansas Sexually Violent Predators Act. Defendant Howard works as the Secretary for the Kansas Department for Aging and Disability Services ("KDADS"). Defendant Rop works as the Administrative Program Director for the Kansas Sexual Predator Treatment Program.

KDADS has supervisory authority over Larned State Hospital ("LSH"), a psychiatric facility, in Pawnee County, Kansas. One of the programs located on the LSH campus is the Sexual Predator Treatment Program ("SPTP"). This program provides treatment for convicted sex offenders who have completed their prison sentences but have been determined by the courts to be violent sexual offenders in need of involuntary inpatient treatment. SPTP's treatment aims to reduce the risk for re-offense, such that rehabilitated offenders could one day return to society. Until then, however, SPTP's sexual offenders reside in a secure facility that functions similarly to a jail or prison. Accordingly, SPTP requires adequate security to establish a safe environment for staff and residents.

## A.      Religious Practices

SPTP residents may freely exercise their religious beliefs. Religious groups and their group activities are colloquially referred to as "religious call-outs." Mallard is a member of Red Wolf, a Native American call-out composed of other SPTP residents at LSH. As a Red Wolf, Mallard participates in various religious rituals including smudging, feasting, and meeting with a spiritual

---

[4] The facts are those uncontroverted by the parties unless otherwise noted.

leader. He also holds and attends various religious ceremonies including sweat lodge ceremonies, pipe and drum ceremonies, healing and passing ceremonies, and annual pow-wow ceremonies.

Mallard defines smudging as the burning of herbs—such as sage, cedar, or sweetgrass—in a bowl and using a feather fan to waft the smoke over a person or object in a clockwise motion while speaking to "Grandfather," the spirit of the Native American way.

Sweat lodge ceremonies occur in "lodges" constructed by willow branches and draped with a tarp. During the ceremony, the members pour water over heated stones to generate steam like a sauna. The stones are heated by a fire outside the lodge and are moved inside with a rake. High temperatures are produced in the confined space, causing the members to sweat. The members complete a certain number of "rounds"[5] and finish the ceremony with a meal.

During pipe and drum ceremonies, members smoke tobacco from a pipe, beat a drum, and sing songs. Usually, each member takes turns smoking from a communal pipe.

Pow-wow ceremonies are annual events consisting of traditional music, singing, dancing, and praying. Sometimes outside guests attend, dressed in ceremonial clothing. During the ceremony, the attendees feast on traditional food.

Healing ceremonies occur when someone is sick, and passing ceremonies occur after someone has died. Mourning the death of a relative or friend may include cutting one's hair, fasting, smudging, displaying ashes on the face, or wearing black headwear. At healing and passing ceremonies, members often smoke tobacco.

At feasts, members gather to celebrate the change of the seasons, such as the winter and summer solstices and the spring and fall equinox. Traditional food like fry bread, corn pemmican, and buffalo meat is served.

---

[5] Neither parry defines a "round" or explain what it entails.

**B.      Religious Restrictions**

The COVID-19 pandemic impacted all groups at LSH by implementing visitor limitations, social distancing, mask-wearing, and other Center for Disease Control guidelines. The scope of the restrictions varied based on LSH's different defined phases. Considerations included active COVID-19 cases in Pawnee County, surrounding counties, and the state, as well as active COVID-19 cases among LSH staff, patients, and residents.

The pandemic exacerbated LSH's already significant staffing issues. Being in a rural location with low unemployment rates, LSH has consistently experienced problems retaining, recruiting, and hiring qualified employees. When COVID-19 first hit Kansas in March 2020, many LSH staff members quit or began working remotely. This significantly reduced the number of staff members physically present at LSH. Based on Nursing Departmental data as of September 2023, SPTP's nursing staff vacancy rate remains at approximately 65–70%.

At times, burn bans and inclement weather conditions also impact group activities at LSH. Due to dry conditions, Pawnee County will occasionally impose a county-wide burn ban which places restrictions on outdoor burning. Larned lacks full-time firefighters, and LSH occasionally has inoperative firefighting equipment. In the past, wildfires have come within just a few miles of LSH. Additionally, LSH follows weather policies that regulate when extreme temperatures warrant canceling outdoor activities. Weather conditions are strictly monitored and reassessed at least every two hours.

Over the past five years, a combination of these factors has affected various religious groups at LSH. During COVID-19, for example, the facility prohibited the use of group pipes because taking turns smoking the same pipe risked spreading disease. However, residents could use individual pipes. Additionally, LSH closed its cafeteria because it could not meet social distancing requirements. But residents could still eat religious meals in their room, by themselves,

so long as they timely requested the special food, paid any expense beyond the normal cost of the meal that LSH would otherwise provide, and the food preparation met basic hygienic and health requirements.

At times, burn bans resulted in canceled smudging sessions and certain ceremonies. In its early stages, LSH interpreted the burn bans to prohibit outdoor smoking and non-liquid smudging. This meant that residents could not smudge by burning sage, but they could use liquid smudge which is a smokeless spray. The burn ban also proscribed residents from smoking tobacco, which impacted pipe and drum ceremonies. Sweat lodge ceremonies were also canceled because the open flame used to heat the rocks created a fire hazard.

## C.      Current Religious Allowances

Today, Native American religious call-outs are permitted to smudge daily, conduct pipe-and-drum ceremonies weekly, conduct sweat lodge ceremonies monthly, conduct pow-wow ceremonies annually, conduct healing and passing ceremonies upon request, and participate in four feasts annually. The Native American call-outs may also submit requests to LSH asking for a spiritual leader to visit the facility for religious reasons.

LSH has an assembly yard where "nature-based" religious call-outs may gather to conduct outdoor religious ceremonies. Red Wolf has its own designated parcel within the assembly yard which contains its sweat lodge and a small garden for growing sage. The members of "nature-based" religious call-outs maintain the grounds in groups during scheduled times outside of the times for that call-out's religious activities.

All religious call-outs may meet for up to two hours per week for religious gatherings. But Native American call-outs are allowed an additional twenty minutes each day to meet for smudging. Because residents are no longer required to use liquid smudge, residents currently burn sage each time they smudge. In addition to daily smudging, residents may smudge at weekly

religious gatherings, during daily fresh-air breaks, and sometimes as a separately scheduled additional activity.

Native American call-outs are currently allowed to conduct pipe-and-drum ceremonies with group prayer pipes. Members often use their two-hour weekly allotment to conduct this ceremony.

In contrast, the Native American call-outs may meet for sweat lodge ceremonies once a month in place of the call-out's weekly gathering for that week. They are allotted four hours to conduct this ceremony and an extra thirty minutes for clean up after the ceremony.

When the Native American call-out decides to hold its annual pow-wow, that ceremony replaces the call-out's sweat lodge ceremony for that month. The members are also allowed four hours to conduct the pow-wow.

Additionally, the Native American call-outs are allowed to meet for passing and healing ceremonies as needed. These occur during the call-out's weekly gatherings or during daily smudging sessions, extending time when necessary.

During feasts, the Native American call-outs receive corn soup, fry bread, ground beef, cheese, lettuce, salsa, a dessert, and beverage. Special meals also occur during the call-out's weekly gathering time. Because the weekly gathering time occurs outdoors, the call-out members are provided with a to-go-style sack lunch.

SPTP permits Native American spiritual leaders to facilitate the Native American religious call-outs if they pass LSH's vetting process. On some occasions, LSH approved certain spiritual leaders, but the residents rejected them. At other times, LSH contacted certain spiritual leaders, but the leaders did not agree to come to LSH.

**D.     Procedural History**

On September 29, 2022, Mallard filed a Complaint arguing, among other things, that Defendants violated his religious freedom. On September 8, 2023, Defendants filed a Motion for Summary Judgment. Mallard responded on October 10, 2023, and Defendants replied on October 20, 2023. Defendants' Motion is now ripe for ruling.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[9] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[10] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[11]

---

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

### III.    Analysis

**A.    Section 1983 and Eleventh Amendment Limitations on Relief**

Mallard raises several issues in his Complaint—specifically, four constitutional violations, two federal statutory violations, and one state statutory violation. Mallard brings each federal claim under 42 U.S.C. § 1983. To prevail on a § 1983 claim, the plaintiff must show that (1) the defendant deprived the plaintiff of a federal right and (2) the defendant acted under color of state law.[12]

Under § 1983, plaintiffs cannot sue officials in their individual capacity for injunctive or declaratory relief.[13] Thus, Mallard's request for injunctive and declaratory relief against Defendants in their individual capacities are dismissed. Additionally, the Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens.[14] Generally, state officials such as Kansas Department of Corrections employees share the state's immunity from suits against them in their official capacities.[15] A narrow exception allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law.[16] But claims for "retrospective declaratory relief" are barred.[17] Thus, Mallard's request for declaratory relief against Defendants in their official capacities are dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

---

[12] *Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002).

[13] *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir. 2022).

[14] *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)).

[15] *See id.*; *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996).

[16] *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

[17] *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004).

Accordingly, the Court will only evaluate whether Defendants, in their official capacities, deprived Mallard of his constitutional or federal statutory rights such that he is entitled to prospective injunctive relief.

**B.    No Genuine Dispute of Material Fact**

Mallard does not controvert any of Defendants' facts because he presents no admissible evidence. At the summary judgment stage, courts must only rely upon admissible evidence to determine whether a genuine issue of material fact exists.[18] Specifically, when plaintiffs submit a brief opposing defendants' motion for summary judgment, all counter-affidavits, declarations, or other materials must comply with 28 U.S.C. § 1746 to be admissible. The affidavits/declarations Mallard submits, however, do not comply with this rule.

Under 28 U.S.C. § 1746, a valid declaration must be made "under penalty of perjury, and dated, in substantially the following form: 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).'" None of Mallard's exhibits contain similar language. An unsworn affidavit or declaration is invalid, inadmissible, and unable to be properly considered on summary judgment.[19] Consequently, the attachments enclosed at the end of Mallard's exhibits are also inadmissible because they are not accompanied by legitimate affidavits or declarations confirming their validity.[20]

---

[18] *See Dodson Aviation, Inc. v. HLMP Aviation Corp.*, 2011 U.S. Dist. LEXIS 36063, at *29 (D. Kan. Mar. 31, 2011) (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005)) (noting that the evidence need not be submitted in a form that would be admissible at trial, however).

[19] *See Leathers v. Leathers*, 2013 U.S. Dist. LEXIS 63484, at *9 (D. Kan. May 3, 2013) (noting that unsigned, unsworn declarations are not properly considered on summary judgment); *Elrod v. Walker*, 2011 U.S. Dist. LEXIS 146114, at *16 (D. Kan. Dec. 20, 2011) (noting that undated, unnotarized "affidavits" are neither admissible nor proper declarations under penalty of perjury).

[20] *See Taylor v. Principi*, 2004 U.S. Dist. LEXIS 2159, at *9 (D. Kan. Feb. 4, 2004) ("Documents filed are inadmissible when they are not accompanied by affidavits attesting to the validity of the documents. When such documents are offered without proper authentication, the Court should not consider them in its ruling."); *Denmon v. Runyon*, 1993 U.S. Dist. LEXIS 15425, at *9 (D. Kan. Oct. 25, 1993) ("A writing is not authenticated simply by attaching it to an affidavit, even if the writing appears on its face to have originated from some governmental agency.").

Although courts construe the substantive pleadings of pro se parties liberally, pro se litigants must still comply with procedural rules or suffer the consequences of noncompliance.[21] Not only did Defendants send Mallard a copy of the requirements in accordance with local Rule 56.1(d), but Mallard cites most of the rule in his Response while discarding the acknowledgement that the penalty of perjury attaches to his words. As such, the Court will not consider Mallard's exhibits or their attachments to controvert Defendants' facts. Rather, the Court will consider all of Defendants' facts admitted and undisputed for purposes of this Motion.[22] Accordingly, the Court finds that this case presents no genuine dispute of material fact and need only decide whether Defendants, as the moving party, are entitled to judgment as a matter of law.

**C.     Judgment as a Matter of Law**

*1.     Religious Land Use and Institutionalized Persons Act (RLUIPA)*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means."[23] Thus, to succeed on a RLUIPA claim, the plaintiff "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government."[24] Religious exercise is substantially burdened when a government:

> (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to

---

[21] *See Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) ("[P]ro se parties [must] follow the same rules of procedure that govern other litigants."); *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (explaining that a party's pro se status does not excuse the obligation to comply with procedural rules).

[22] *See* Fed. R. Civ. P. 56(e)(2).

[23] 42 U.S.C. § 2000cc-1(a).

[24] *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010).

engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief.[25]

But not every infringement on a religious exercise will constitute a substantial burden.[26] At a minimum, the substantial burden test requires more than "mere inconvenience, negligence, and isolated or sporadic incidents."[27]

Here, Mallard alleges the second type of substantial burden—that the government has prevented him from participating in conduct motivated by a sincerely held religious belief. Specifically, Mallard's Complaint alleges that as a member of a Native American Red Wolf religious call-out group, Defendants prevented him from (1) smudging twice a day, (2) using the sweat lodge once a week for five hours, (3) holding an unconditional Pipe and Drum ceremony once a week, (4) having at least eight feasts per year, (5) holding an annual Pow-Wow, (6) holding healing or passing ceremonies, (7) meeting with a spiritual guide or Native American elder, and (8) using a designated outdoor area to practice his religion.

The uncontroverted facts differ from the allegations in the Complaint. As to Mallard's first four allegations, Defendants contend that Mallard is still allowed to engage in his religious practices, although not to the frequency and duration he expects. As to the remaining four allegations, Defendants contend that no prohibitions exist and that Mallard is and has been allowed to engage in those practices freely. The Court will address each of Mallard's allegations in turn.

a. Smudging

Currently, residents are allowed to smudge at least once a day for about twenty minutes. Smudging occurs at weekly religious gatherings, during daily fresh-air breaks, and sometimes as

---

[25] *Id.* at 1315.

[26] *Strope v. Cummings*, 381 F. App'x 878, 881 (10th Cir. 2010).

[27] *Schlobohm v. Ash*, 2023 U.S. Dist. LEXIS 10583, at *18 (D. Kan. Jan. 20, 2023).

a separately scheduled daily activity. In his Complaint, Mallard claims that the facility should allow him to smudge twice a day—once in the morning and once in the evening. In his Response, however, Mallard admits that "Native American practice requires *a smudge period* of about *fifteen minutes* per day."[28]

The Court cannot find that twenty minutes of once-daily smudging substantially burdens Mallard's religion when Mallard himself cannot consistently identify the frequency and duration of smudging that his religion requires. Moreover, Mallard does not explain how limiting smudging to once a day for twenty minutes substantially burdens the practice of his religion, forces him to modify his religious behavior, or violate his religious beliefs.[29] Without such evidence, Defendants are entitled to summary judgment on this issue.

   b. Sweat Lodge

Similarly, Mallard requests five-hour sweat lodge ceremonies every week instead of the current practice of four-hour sweat lodge ceremonies every month. Then, in his Response, Mallard states that he is willing to accept a once per month sweat ceremony for eight hours. He rationalizes his request by explaining that it takes the rocks one to one and a half hours to heat to temperature, fifteen to twenty minutes to complete one round, about forty-five minutes to recover and prepare for the next round, and "at least four rounds must be completed."

Mallard fails to provide any evidence demonstrating why completing "at least four rounds" is necessary to practice his religion. Seemingly, the duration and frequency of the ceremony does not substantially burden the practice of Mallard's religion as evidenced by his willingness to accept

---

[28] Emphasis added.

[29] *Strope*, 2009 U.S. Dist. LEXIS 15720, at *20–21, 23; *accord Cryer v. Clarke*, 2012 U.S. Dist. LEXIS 183568, at *25–26 (D. Mass. Sep. 7, 2012) ("[A]lthough [Plaintiff] has defined the practice of smudging in his various filings, he does not explain how his inability to smudge daily coerces him into modifying his behavior or violating his beliefs.").

holding a sweat ceremony once a month after originally requesting a sweat ceremony every week. This is not a case in which officials have banned sweat lodges outright—even though many courts have upheld such restrictions.[30] Rather, Mallard may participate in a sweat lodge ceremony once a month for four hours. Therefore, Defendants are entitled to summary judgment on this issue because Mallard fails to provide any evidence showing that limiting the length of his sweat lodge ceremonies substantially burdens the practice of his religion.

### c.      Pipe & Drum Ceremonies

Mallard asks to engage in a pipe and drum ceremony once per week "without fail." Despite LSH being a tobacco-free hospital, the Native American call-outs may smoke tobacco in an approved outdoor area during pipe and drum ceremonies. The facility does not permit smoking indoors. Thus, sometimes pipe and drum ceremonies are canceled due to lack of staff, county burn bans, or extreme weather. Mallard argues that cancelations—of any kind—violate his religious freedom.

The evidence, however, demonstrates that these prohibitions either occurred for a limited time and no longer exist, or have the potential to occur for a limited time and cannot be controlled by Defendants. Regardless, the substantial burden test requires more than mere inconvenience or isolated incidents.[31] By alleging that Defendants cancel pipe and drum ceremonies from time to time due to lack of staff, county burn bans, or extreme weather, Mallard "has described only a moderate impediment to—and not a constructive prohibition of—his religious exercise."[32]

---

[30] *See, e.g.*, *Fowler v. Crawford*, 2007 U.S. Dist. LEXIS 53070, at *20-21 (W.D. Mo. July 23, 2007) (holding that although the denial of a sweat lodge is a substantial burden on plaintiff's exercise of his Native American religion, denial furthers a compelling governmental interest by the least restrictive means); *Hamilton v. Schriro*, 74 F.3d 1545, 1557 (8th Cir. 1996) (upholding an outright prohibition on sweat lodge ceremonies).

[31] *Schlobohm*, 2023 U.S. Dist. LEXIS 10583, at *18.

[32] *Abdulhaseeb*, 600 F.3d at 1325 (Gorsuch, J., concurring).

Although it may be burdensome to forgo an occasional pipe and drum ceremony, it is not the substantial burden that RLUIPA proscribes. As such, Defendants are entitled to summary judgment on this issue.

        d.     Feasts

Mallard complains that LSH violates his statutory rights to religious feasts in two ways. First, he claims that the number of feasts allowed by the facility is not enough. Second, he claims that the type of food the facility provides and the method of its preparation substantially burdens his religion. The Court will address both concerns.

To start, Mallard claims that he "cannot have a feast of any kind for any reason." Mallard then requests that his call-out be permitted eight feasts for various reasons including "the winter solstice, summer solstice, fall equinox, spring equinox, Pow-Wow, tribe get-togethers, and other necessary holidays." He also requests a feast after each sweat ceremony.

According to LSH's policy, each religious call-out is permitted up to four special meals per year to celebrate religious holidays. Currently, LSH recognizes "seasonal equinoxes and solstices including quarterly Pow Wows" as the Native American call-out's "holidays." But as Defendants pointed out, the government has a compelling interest in allowing equal time for each religious group.[33] Even though other religious groups also celebrate more than four holidays each year, each call-out gets the same allotment for special meals. Accordingly, the Native American call-outs cannot expect to receive eight or more special meals when every other religious group only gets four.

Mallard provides no evidence that his religion is substantially burdened by having only four feasts instead of eight. In fact, he fails to list eight holidays he wishes to celebrate. At best, he

---

[33] *Brower v. Works*, 41 F. App'x 802, 803 (6th Cir. 2002).

mentions five—the four seasonal feasts and one annual Pow-Wow. Mallard's demand essentially asks the facility to standby for any possible feasts that may emerge, such as when the tribes get together or other unnamed "necessary holidays." Mallard also asks for a feast after each sweat ceremony—something that he believes should occur once a week. At other points, Mallard says that feasts should occur "no less than four per year, but usually a total of eight." The Court cannot find that four feasts per year substantially burdens Mallard's religion when Mallard himself cannot consistently identify how many feasts his religion requires. Thus, because Mallard has failed to demonstrate how Defendants' denial of additional feasts has substantially burdened his religion, the Court finds that Defendants are entitled to summary judgment on this issue.

Next, Mallard claims that the food LSH provides for his call-out's feasts are inadequate. Currently, Native American call-outs are provided corn soup, fry bread, beef, cheese, lettuce, salsa, a dessert, and a beverage for each feast. Instead, Mallard requests buffalo, corn, and fry bread. The Tenth Circuit has held that not "every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise."[34] Moreover, LSH cannot be expected to pay extra costs for special meals beyond the normal daily meal rate per resident. LSH also cannot preferentially subsidize the exercise of religion by paying more for Native American feasts than it already pays for residents' usual daily meals.

Finally, Mallard claims that feasts must be prepared by a practicing Native American, over an open flame, and contain traditional and seasonal foods. He also asks that the facility provide an outdoor "area for preparation of the feasts." Defendants have provided uncontroverted evidence explaining why adhering to these requests would present various logistical and security problems.

---

[34] *Abdulhaseeb*, 600 F.3d at 1321.

First, special meals are provided by LSH's food services contract provider. If a verified provider does not have the foods requested by the call-out, the facility cannot obtain the food. Getting food from an unverified vendor comes with a host of health and safety concerns.

Furthermore, LSH's cafeteria is currently closed. Turnover in staff resulted in the loss of institutional knowledge for how to fully re-open the cafeteria. LSH/SPTP currently anticipates that religious meals and feasts may be observed in the future. However, the facility is likely to adopt a policy that requires meals to be separately packaged, properly prepared, and the additional cost of the meals/feasts must be borne by residents or outside donors.

Lastly, the call-out will not accept food prepared by a non-Native American, and the food must be cooked outside over a fire. This would require that LSH not only build an outdoor "preparation area" according to health and safety regulations, but also screen and hire a Native American to visit the facility multiple times a year to cook for the call-out.

The only other option is to allow the Native-American residents to cook. In the past, residents failed to prepare food at proper temperatures, which rendered it unsafe for consumption. There are also unacceptable security and safety problems associated with allowing residents to prepare the meals, such as access to knives, fire, and other potentially dangerous tools.

The substitutionary food Mallard receives may be inconvenient, but more is required to demonstrate a substantial burden.[35] Mallard has not received a "flat denial" of food his religion deems necessary, nor is Mallard provided with inedible food.[36] Rather, the food Mallard requests—though imperfect—is acceptable and is provided at the same frequency as all other

---

[35] *Schlobohm*, 2023 U.S. Dist. LEXIS 10583, at *18.

[36] *Strope*, 381 F. App'x at 882 (illustrating the distinction between substantial burden and inconvenience by comparing the flat denial of a halal diet with a sporadic incident in which a prisoner's meal was rendered inedible by service of prohibited items contaminating his tray).

special meals for all other religious groups. As such, the Court finds that Mallard has failed to demonstrate how Defendants' provision of substitutionary food has substantially burdened his religion. Consequently, Defendants are entitled to summary judgment on this issue.

    e.    Pow-Wows

Mallard claims that Defendants deny him an annual pow-wow ceremony. However, Defendants presented uncontroverted evidence that annual pow-wow ceremonies are currently allowed for Native American call-outs. The pow-wow may last up to four hours and takes place in lieu of the call-out's sweat lodge ceremony for that month. Mallard has not presented any evidence to the contrary.

To the extent Mallard argues he should receive both a pow-wow and sweat lodge ceremony in the same month, the Court still finds that Mallard fails to demonstrate a substantial burden to his religion. Again, mere inconvenience or sporadic incidents do not constitute a substantial burden.[37] Thus, the Court finds that holding eleven sweat lodge ceremonies and one pow-wow ceremony per year withstands RLUIPA's substantial burden test. As such, Defendants are entitled to summary judgment on this issue.

    f.    Healing & Passing Ceremonies

Both parties stipulate that healing and passing ceremonies are currently allowed. But Mallard wants healing ceremonies to be conducted as soon as an illness or hospitalization is learned of and passing ceremonies to be conducted within twenty-four hours of the passing.

Healing and passing ceremonies include smoking a prayer pipe. In the past, Native American religious call-outs requested passing ceremonies so frequently that for several weeks they would happen more days than not. This often interfered with scheduling and staffing for

---

[37] *Schlobohm*, 2023 U.S. Dist. LEXIS 10583, at *18.

treatment, medical appointments, and other primary operations of the facility. To solve this problem, LSH now allows the call-outs to conduct healing and passing ceremonies during daily smudging times or sometimes as separate ceremonies during the week.

From the evidence presented, the Court concludes that Mallard is allowed to conduct both healing and passing ceremonies daily and is either given extended time for sessions as needed or has separate ceremonies altogether. Thus, Mallard has failed to identify any burden—let alone a substantial burden—to his religion. As such, Defendants are entitled to summary judgment on this issue.

g.   Spiritual Leader

Mallard contends that Defendants continue to deny a Native American spiritual leader access to the facility. However, the uncontroverted evidence demonstrates that Native American spiritual leaders have been permitted to facilitate Native American religious call-outs in SPTP, but the residents rejected them. If the leaders of the Native American religious call-outs request and approve a Native American spiritual leader, LSH will vet and may approve that spiritual leader to help facilitate Native American religious call-outs at the SPTP. The spiritual leader must also agree to the arrangement.

According to LSH's patient policy and procedures manual, "[v]etting is a thorough and diligent review of . . . Leaders of any religious or spiritual body to assure that they are in 'good standing' with their denomination or church/group for the security and safety of patients and residents during their stay at LSH." Defendants provided evidence that on several occasions LSH's chaplain reached out to Native American spiritual leaders who were requested by SPTP residents, but the leaders did not agree to come facilitate the Native American religious call-outs. Mallard, on the other hand, has provided no evidence demonstrating that he ever submitted requests for

spiritual leaders or that LSH denied those requests. Without such evidence, the Court cannot find that LSH's policies or procedures substantially burden Mallard's religion. Thus, Defendants are entitled to summary judgment on this issue.

h.      Designated Area

Mallard requests that the facility provide him with "a proper area for the Native American religion" so that he may practice his beliefs. Not only does he fail to allege that he lacks a designated area, but he also fails to allege that lacking a designated area violates his religious beliefs. In fact, LSH provides the Native American call-outs—and specifically, the Red Wolf call-out—with a separate plot of outdoor space for religious ceremonies. On it, Red Wolf constructed a sweat lodge and a small garden for growing sage. Because Mallard fails to identify any burden—let alone a substantial burden—to his religion, Defendants are entitled to summary judgment on this issue.

2.      *First Amendment Free Exercise Claim*

To succeed on a First Amendment Free Exercise claim, the plaintiff must demonstrate that the defendants "substantially burdened his sincerely-held religious beliefs."[38] Free Exercise claims share the same substantial burden standard as RLUIPA claims.[39] Because the Court finds that Mallard fails to demonstrate how Defendants substantially burdened his sincerely-held religious beliefs under RLUIPA, consequently Mallard also fails to meet that same burden for his Free Exercise claim. Accordingly, Defendants are entitled to summary judgment on this issue.

---

[38] *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

[39] *Blair v. Raemisch*, 804 F. App'x 909, 917 (10th Cir. 2020); *Tenison v. Byrd*, 826 F. App'x 682, 690–91 (10th Cir. 2020).

### 3.     Religious Freedom and Restoration Act (RFRA)

Mallard contends that Defendants violated RFRA by substantially burdening his exercise of religion. Although RFRA originally applied to all federal and state laws, the Supreme Court has since held that Congress exceeded its authority under Section 5 of the Fourteenth Amendment and concluded that RFRA was unconstitutional as applied to the states.[40] As such, Mallard cannot bring RFRA claims against state officials or employees, including the Defendants in this case.

### 4.     Eighth & Fourteenth Amendments

Mallard cites to the Eighth and Fourteenth Amendments but does not explain how either apply to this case. Therefore, Mallard fails to proffer any evidence that would permit a reasonable jury to decide the issue in either party's favor. As such, Defendants are entitled to summary judgment on this issue.

### 5.     Fourth Amendment

Mallard raises a Fourth Amendment violation for the first time in his Response to Defendants' Motion. However, at the summary judgment stage of litigation, a court will not consider new claims which the plaintiff did not include in his complaint and presented for the first time in a response brief.[41] Thus, Mallard's Fourth Amendment violation claim is not properly before this Court. Consequently, if Mallard wishes to assert this new claim, he must seek leave to file an amended complaint.[42]

### 6.     State Law Claim

In addition to his federal claims, Mallard asserts a state law claim for a violation of his religious freedom under the KPRFA. A district court may decline to exercise supplemental

---

[40] *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

[41] *Turner v. McKune*, 2001 U.S. Dist. LEXIS 22249, at *8 n.1 (D. Kan. Dec. 21, 2001).

[42] *Id.*

jurisdiction over state law claims if "summary judgment has been granted in favor of all defendants on all of plaintiff's federal claims."[43] The Tenth Circuit advises the district courts to "generally decline to exercise supplemental jurisdiction when no federal claims remain because '[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'"[44] Because this Court has resolved all of Mallard's federal claims in Defendants' favor, it declines to exercise supplemental jurisdiction over his remaining state law claims. Thus, the Court dismisses Mallard's KPRFA claim without prejudice.

     **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 27) is **GRANTED.**

     **IT IS SO ORDERED.**

     This case is closed.

     Dated this 22nd day of February, 2024.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[43] *Taliaferro v. Voth*, 1992 U.S. Dist. LEXIS 13894, at *27 (D. Kan. Aug. 19, 1992); *see also Lord v. Hall*, 520 F. App'x 687, 693 (10th Cir. 2013) ("The district court granted summary judgment, and in doing so . . .[t]he state-law claim should have been dismissed without prejudice.").

[44] *Hubbard v. Okla. ex rel. Dep't Hum. Servs.*, 759 F. App'x 693, 714 (10th Cir. 2018) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).